1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

8    KIMBERLEY J. DAVIS,

9                    Plaintiff,

10        v.

11    PORT ANGELES SCHOOL DISTRICT et
     al.,

12                    Defendants.

13

Case No. C20-5448-BHS-SKV

REPORT AND RECOMMENDATION

14                    I.        INTRODUCTION

15        This is an employment discrimination case brought by Plaintiff Kimberley J. Davis

16    against Defendants Port Angeles School District ("PASD" or "District"), Amity Butler, and

17    Patricia Reifenstahl.  *See* Dkt. 1.  This matter comes before the Court on Defendants' Motion

18    for Summary Judgment, Dkt. 28, and Plaintiff's Motion for Partial Summary Judgment, Dkt. 35.

19    Having thoroughly considered the briefing and the relevant record, the Court finds that

20    Defendants' Motion, Dkt. 28, should be GRANTED IN PART and DENIED IN PART and

21    Plaintiff's Motion, Dkt. 35, should be DENIED for the reasons stated herein.

22        / / /

23        / / /

REPORT AND RECOMMENDATION - 1

II.       BACKGROUND

A.       History of Plaintiff's Employment with Defendant PASD

Plaintiff is a certified special education teacher who began working for Defendant PASD at Dry Creek Elementary School in August 2001. Dkt. 30 ¶ 2. Defendant Amity Butler taught at Dry Creek Elementary School while Plaintiff was employed there. Dkt. 31 ¶ 2. In 2007, Defendant Butler earned her principal certification and, in 2009, was named principal of Franklin Elementary School. *Id.* In 2010, Plaintiff moved to Franklin Elementary School to teach first through third grade special education. Dkt. 1 ¶ 4.1; Dkt. 31 ¶ 5. Defendant Butler, as principal, became Plaintiff's supervisor and began evaluating her performance on an annual basis. Dkt. 31 ¶ 5.

From school year 2001-02 through school year 2012-13, Plaintiff's job performance was rated as "Satisfactory" on a performance evaluation scale that rated teachers as either "Satisfactory" or "Unsatisfactory." Dkt. 31 ¶ 6; Dkt. 46-1 at 18–37. Defendant Butler rated Plaintiff's performance as "Satisfactory" in school years 2010-11, 2011-12, and 2012-13. Dkt. 31 ¶ 6; Dkt. 46-1 at 18–21. In school year 2013-14, Defendant PASD implemented a new statutorily required evaluation system that rated teachers on a four-level scale as "Level 1: Unsatisfactory," "Level 2: Basic," "Level 3: Proficient," or "Level 4: Distinguished." Dkt. 31 ¶ 7. This new system required supervisors to evaluate teachers comprehensively against eight criteria. *Id.* If a teacher received a "Level 3: Proficient" or "Level 4: Distinguished" evaluation, then that teacher could choose to be placed on a three-year cycle of "focused" evaluations where only criteria selected by the teacher would be evaluated. *Id.*

Using this system, in school year 2013-14, Defendant Butler evaluated Plaintiff comprehensively and rated her performance as "Level 3: Proficient." Dkt. 31 ¶ 8; Dkt. 46-1 at

15–17.  As a result, in school year 2014-15, Plaintiff was placed on a three-year cycle of "focused" evaluations.  Dkt. 31 ¶ 9.  That same year, Defendant Butler rated Plaintiff's performance as "Level 4: Distinguished."  *Id.*; Dkt. 46-1 at 13–14.  The following year, school year 2015-16, Defendant Butler rated Plaintiff's performance as "Level 3: Proficient."  Dkt. 31 ¶ 11; Dkt. 46-1 at 11–12.

B.    The 2016-17 School Year

At the beginning of the 2016-17 school year, Defendant PASD adopted the Styer-Fitzgerald curriculum ("Styer") for special education students in self-contained classrooms like Plaintiff's.  Dkt. 31 ¶ 13; Dkt. 33 ¶ 5.  The District trained special education teachers to use the curriculum at the beginning of the school year and teachers were expected to implement it over the course of the year.  Dkt. 31 ¶ 13; Dkt. 33 ¶ 5.  Styer required teachers to first complete an initial assessment of each student to determine whether the curriculum was appropriate for them. Dkt. 48 at 38 (148:8–14).  If teachers determined it was, they were expected to identify and work with each student on individualized academic goals and collect data pertaining to those goals in the Styer curriculum notebooks. *See* Dkt. 33 ¶¶ 8–10; Dkt. 48 at 40 (155:9–156:16), 42 (163:22–164:11).  Defendants allege Plaintiff failed to implement Styer in the 2016-17 school year.  Dkt. 28 at 3; Dkt. 33 ¶¶ 7–9; Dkt. 48 at 38–40 (147:1–156:24).

In September 2016, Defendant Butler called Plaintiff into her office to tell her that two students had reported seeing Plaintiff kissing her female partner, Tanya Pepper, in the school parking lot.  Dkt. 43 at 5; Dkt. 31 ¶ 12; Dkt. 57-1 at 15–16 (52:3–56:7).  Plaintiff alleges Defendant Butler told Plaintiff she needed to "watch it."  Dkt. 43 at 5; Dkt. 57-1 at 15–16 (52:3–56:7).  Defendant Butler recalls telling Plaintiff "something to the effect of, 'sometimes our community isn't as open-minded as we would like.'"  Dkt. 31 ¶ 12.  Plaintiff perceived this as a

1   "very big warning" not to be open or affectionate with her partner.  Dkt. 57-1 at 15–16 (53:25–

2   56:7).

3          Following this incident, Plaintiff alleges Defendant Butler's treatment of her changed

4   from "friendly and professional" to "hostile and unprofessional."  Dkt. 1 ¶ 4.10.  According to

5   Plaintiff, prior to the 2016-17 school year, she had been "extremely closeted" and never brought

6   her partners to school functions or talked about her relationships.  Dkt. 43 at 4; Dkt. 57-1 at 28

7   (102:3–13).  With Ms. Pepper, however, Plaintiff alleges this changed.  Dkt. 57-1 at 28 (102:19–

8   103:8).  During the 2016-17 school year, Ms. Pepper started volunteering regularly in Plaintiff's

9   classroom, on school field trips, and at school functions.  *Id.* at 28 (103:9–104:9); Dkt. 43 at 4;

10  Dkt. 46-3 at 5–6 (11:15–15:2).  While Defendant Butler had known about Plaintiff's sexuality

11  for years, Dkt. 57-1 at 15 (52:14–20), Plaintiff contends she treated Plaintiff differently when

12  Plaintiff was "out," comfortable, and visible with her sexuality at school.  *Id.* at 28 (104:10–16).

13  According to Plaintiff, Defendant Butler regarded her and Ms. Pepper with "disdain and disgust"

14  at school, Dkt. 43 at 4–5; Dkt. 46-3 at 14 (48:24–49:11), 15 (50:16–51:8); Dkt. 57-1 at 6–7

15  (16:4–21:17), 12 (38:2–40:25), and was openly hostile to them at the Christmas party Defendant

16  Butler hosted that year.  Dkt. 43 at 8; Dkt. 46-3 at 11–12 (34:23–38:15); Dkt. 57-1 at 19 (67:7–

17  23).  Plaintiff also alleges Defendant Butler began withholding resources and support from her in

18  an effort to drive her out of the school.  Dkt. 43 at 6–7; Dkt. 57-1 at 17 (59:2–16).

19          For example, Plaintiff contends she asked Defendant Butler for additional

20  paraprofessional support in her classroom, but Defendant Butler refused to consider her request,

21  instead telling her to "get out" of teaching special education.  Dkt. 43 at 6; Dkt. 57-1 at 16

22  (56:21–57:10).  She further contends Defendant Butler started expressing a preference for

23  Plaintiff's heterosexual teaching partner, Christine Richardson, by promoting Ms. Richardson as

1  the preferred standard for teaching special education, requesting that Ms. Richardson give

2  presentations to staff, and providing Ms. Richardson with more paraprofessional support than

3  Plaintiff.  Dkt. 43 at 6–7; Dkt. 57-1 at 17 (60:13–61:3), 55 (210:6–16).

4       In September 2016, Plaintiff alleges Defendant Butler unilaterally assigned Defendant

5  Reifenstahl as a paraprofessional to Plaintiff's classroom without first consulting Plaintiff.  Dkt.

6  43 at 7; Dkt. 57-1 at 20 (72:20–73:24).  According to Plaintiff, Defendant Reifenstahl, a friend of

7  Defendant Butler's, also treated her and Ms. Pepper with disgust and disdain, frequently

8  referencing her religion, deliberately disobeying Plaintiff's classroom instructions, undermining

9  Plaintiff's authority, and excluding Plaintiff from classroom discussions.  Dkt. 43 at 7–8, 15;

10  Dkt. 46-3 at 13 (42:25–45:1); Dkt. 57-1 at 13–14 (43:6–49:24), 50–51 (193:13–195:25).  After

11  telling Defendant Reifenstahl that she and Ms. Pepper would be going away for the holidays,

12  Plaintiff recalls Defendant Reifenstahl saying that Plaintiff's holiday celebrations were

13  "untraditional," which Plaintiff took as a reference to her sexual orientation.  Dkt. 57-1 at 13

14  (44:19–45:6).

15       In June 2017, Plaintiff alleges Ms. Richardson approached her and said, "I know you're

16  being railroaded by the administration."  Dkt. 43 at 9; *see also* Dkt. 57-1 at 10 (32:24–33:18).

17  That same month, Defendant Butler evaluated Plaintiff using a "focused" evaluation and rated

18  her performance for the 2016-17 school year as "Level 4: Distinguished."  Dkt. 31 ¶ 15; Dkt. 46-

19  1 at 9–10.

20       C.    The 2017-18 School Year

21       Plaintiff alleges Defendant Butler's discriminatory conduct persisted into the 2017-18

22  school year.  Per Plaintiff, Defendant Butler (among other things) (1) continued to treat Plaintiff

23  and Ms. Pepper in a rude and disdainful manner at school functions and at the Christmas party

Defendant Butler hosted that year, Dkt. 43 at 10; Dkt. 46-3 at 15 (51:9–52:25); Dkt. 57-1 at 12 (38:2–41:3), 21 (75:2–76:18); (2) continued to withhold resources from Plaintiff, including additional paraprofessional support, Dkt. 43 at 10, 18; Dkt. 57-1 at 37 (140:1–141:13), 55–56 (212:8–214:10); (3) excluded Plaintiff from paraprofessional evaluations, Dkt. 43 at 11; Dkt. 57-1 at 43 (162:20–163:3); (4) directed Plaintiff to attend training classes designed for paraprofessionals instead of certified special education teachers, Dkt. 43 at 15; Dkt. 57-1 at 47 (179:1–18); and (5) harassed Plaintiff about her hours, requiring her to remain on campus during contract hours while permitting heterosexual teachers to leave early, Dkt. 43 at 12; Dkt. 57-1 at 45–46 (173:25–177:23).  On one occasion, Plaintiff recalls Defendant Butler asking Plaintiff if Ms. Pepper was "someone new," which Plaintiff deemed derogatory.  Dkt. 1 ¶ 4.25; Dkt. 57-1 at 21–22 (76:22–78:13).

Defendant Butler, on the other hand, contends Plaintiff's teaching performance deteriorated during the 2017-18 school year.  She contends (1) Plaintiff again failed to implement the Styer curriculum in her classroom and inconsistently recorded Styer data in the designated Styer notebooks; (2) struggled to provide her students with appropriate academic and behavioral support; (3) failed to collect the data necessary to address her students' needs in their Individualized Education Plans ("IEP"); (4) did not implement visual schedules for her students; and (5) treated her students unequally.  Dkt. 31 ¶ 20–21.

Defendant Butler also received concerned reports from school employees regarding Plaintiff's teaching performance.  For example, Ms. Richardson, who received students from Plaintiff's class, told Defendant Butler that Plaintiff's students were not performing in accordance with the progress indicated in their IEPs and she suspected the data collected to assess their progress was inaccurate.  Dkt. 31 ¶ 16; Dkt. 33 ¶¶ 4, 13.  Further, Jaime Croft, a

1    speech-language pathologist for the District, told Defendant Butler she believed Plaintiff had

2    "falsified" a student's IEP to reflect an unusual amount of speech-language services.  Dkt. 31

3    ¶ 19; *see also* Dkt. 31-1 at 13–15; Dkt. 57-1 at 52 (198:5–20).  Defendant Butler asked Plaintiff

4    to work with Tiffany Blore, a special education instructional coach for the District, to improve

5    her performance.  Dkt. 43 at 13; Dkt. 44 ¶ 2; Dkt. 49 at 10–11 (36:20–38:4); Dkt. 57-1 at 23

6    (82:21–24), 44 (166:19–25).

7        On February 14, 2018, Plaintiff took the day off work.  Dkt. 31 ¶ 18; Dkt. 57-1 at 40

8    (151:22–152:4).  One of her students came to school with Valentine's Day treats for the general

9    education students.  Dkt. 31 ¶ 18; Dkt. 57-1 at 40 (152:5–24).  The student was unable to

10   distribute the treats, however, because Plaintiff's substitute teacher did not take the student to his

11   general education class.  Dkt. 31 ¶ 18; Dkt. 57-1 at 40–41 (152:5–155:1).  The student's mother

12   became angry with Plaintiff over the incident in an IEP meeting and filed a formal complaint

13   with Defendant PASD.  Dkt. 31 ¶ 18; Dkt. 57-1 at 39–40 (149:4–151:16), 42 (159:5–160:4).

14   Defendant Butler later learned that Plaintiff had not been in school on Valentine's Day.  Dkt. 31

15   ¶ 18.  Plaintiff alleges Defendant Butler subsequently called Plaintiff into her office and told

16   Plaintiff she was "so pissed" at her, and was embarrassed and ashamed of her.  Dkt. 43 at 10;

17   Dkt. 57-1 at 24 (89:17–24), 42 (160:5–161:24).

18        At the end of the 2017-18 school year, Defendant Butler evaluated Plaintiff

19   comprehensively and rated her performance as "Level 2: Basic."  Dkt. 31 ¶ 20; Dkt. 46-1 at 2–5.

20   She provided Plaintiff with a checklist of things to implement in her classroom, most of which

21   Plaintiff alleges she was already doing.  Dkt. 43 at 11; Dkt. 44 ¶ 2; *see also* Dkt. 44-1.  Plaintiff

22   submitted a rebuttal to Defendant Butler's evaluation, but did not accuse Defendant Butler or

23   anyone else of discrimination.  Dkt. 31 ¶ 23; *see also* Dkt. 31-1 at 21–23.

1    D.    The 2018-19 School Year

2    Prior to the 2018-19 school year, Plaintiff alleges she reviewed the checklist with Ms.

3  Blore, and Ms. Blore confirmed Plaintiff had implemented the requested changes and was ready

4  for the school year.  Dkt. 43 at 12–13; Dkt. 44 ¶ 2.  Plaintiff further alleges Ms. Blore

5  recommended she incorporate more decorations, like rainbows, into her classroom, asking

6  Plaintiff, "You like rainbows, don't you?"  Dkt. 43 at 13; *see also* Dkt. 57-1 at 23 (84:7–16).

7  Plaintiff took this as a reference to her sexuality and a message from Defendant Butler.  Dkt. 43

8  at 13; Dkt. 57-1 at 23 (84:7–85:9).

9    When school resumed for the 2018-19 school year, Plaintiff contends Defendant Butler

10  repeatedly instructed her to change her teaching, providing her with an ever-growing list of

11  things she needed to do differently.  Dkt. 43 at 16; Dkt. 44 ¶ 1; Dkt. 57-1 at 18 (62:6–64:20).

12  According to Plaintiff, she consistently implemented the requested changes, but Defendant

13  Butler kept changing the requirements and refused to acknowledge Plaintiff's progress or review

14  the documentation of her efforts.  Dkt. 43 at 16; Dkt. 44 ¶ 1; Dkt. 57-1 at 18 (62:6–64:20), 48

15  (184:19–185:14).  On September 24, 2018, and December 5, 2018, Defendant Butler formally

16  observed Plaintiff's teaching.  Dkt. 31 ¶ 24.  Defendant Butler alleges she did not see Plaintiff

17  using the Styer curriculum in her classroom.  Dkt. 47 at 47 (183:20–184:3).

18    On January 24, 2019, Defendant Butler placed Plaintiff on a potential two-year Plan of

19  Improvement ("PIP").  Dkt. 43 at 13; Dkt. 31 ¶ 24.  The PIP required Plaintiff to (among other

20  things) (1) provide weekly lesson plans to Defendant Butler; (2) meet with Defendant Butler

21  twice a month to discuss her progress; (3) and use the Styer curriculum with all students who

22  would benefit from it.  Dkt. 31-2 at 2–3.  For students for whom Styer was not appropriate, the

23  PIP required Plaintiff to outline a clear path for their instruction, including how she intended to

keep data and monitor progress.  *Id.* at 3.  Further, the PIP required Plaintiff to share the data she collected with Defendant Butler.  *Id.*

That same month, Plaintiff alleges Defendant Butler placed a female first grade student in Ms. Richardson's class instead of Plaintiff's because she did not want the student exposed to Plaintiff's lesbian relationship.  Dkt. 43 at 16–17; Dkt. 57-1 at 26–27 (97:9–98:18).  She also alleges Defendant Butler started controlling and rewriting the IEPs for her students and refused to sign an IEP without cause, which resulted in it expiring.  Dkt. 43 at 17–18; Dkt. 57-1 at 49 (186:14–189:11).

In April 2019, Plaintiff met with union personnel, including her union representative, Eric Pickens, to report that she felt she was being discriminated against by Defendant Butler. Dkt. 43 at 14; Dkt. 57-1 at 24 (87:16–88:13).  Mr. Pickens spoke with Defendant Butler about Plaintiff's complaint.  Dkt. 57-1 at 24 (87:16–88:13); Dkt. 47 at 64 (250:4–251:14). Subsequently, on or around May 28, 2019, at a weekly staff meeting, Plaintiff contends Defendant Butler announced that Plaintiff was not scheduled for a yearly evaluation in front of other staff in an effort to humiliate her.  Dkt. 43 at 18; Dkt. 57-1 at 56 (214:11–215:9).

E.  <u>Defendant PASD's Investigation into Plaintiff's Alleged Falsification of Student Data</u>

On or around May 22, 2019, Carole Copeland, a paraprofessional in Plaintiff's classroom, reported concerns about Plaintiff's teaching to Defendant Butler.  Dkt. 31 ¶ 25; Dkt. 50-4 at 2–3.  She alleged that sometime before spring break, the Styer notebooks disappeared from Plaintiff's classroom, and when they returned, they contained new data entries that were "backdated" to September 2018.  Dkt. 31 ¶ 25; Dkt. 31-2 at 5.  She further alleged that sometime in May 2019, Plaintiff recorded behavioral data for a student Ms. Copeland had been working

with one-on-one which was inconsistent with the behavior Ms. Copeland had witnessed that day. Dkt. 31 ¶ 25; Dkt. 31-2 at 5.  When Ms. Copeland told Plaintiff she had not witnessed the behavior Plaintiff had recorded, Plaintiff allowed Ms. Copeland to change the data.  Dkt. 31 ¶ 25; Dkt. 31-2 at 5.

Following Ms. Copeland's complaint, Defendant Butler consulted with Defendant PASD's Human Resources Director, Scott Harker, and removed the Styer notebooks from Plaintiff's classroom.[1]  Dkt. 1 ¶ 4.68; Dkt. 31 ¶ 26.  After reviewing the notebooks, she noticed certain data had been recorded on dates when either Plaintiff and/or the student in question were not in school, and she suspected the data had been falsified.  Dkt. 31 ¶ 26; Dkt. 47 at 20 (75:15– 21), 47–48 (184:10–185:3), 49 (190:9–17).  Mr. Harker advised Defendant Butler to contact Defendant PASD's Director of Special Services, Pamela Sanford, and ask her to review the notebooks to determine whether she had the same impression.  Dkt. 30 ¶ 3; Dkt. 31 ¶ 26; Dkt. 32 ¶ 2.  Defendant Butler did so on June 10, 2019, and Ms. Sanford reviewed the notebooks between June 10, 2019, and June 12, 2019.  Dkt. 32 ¶¶ 2–3.  In her review, Ms. Sanford discovered additional data discrepancies, including data that had been recorded for student IEP goals that had not yet been created and data that was unrelated to the IEP goals of the students for whom it was collected.  Id. at ¶ 3; Dkt. 32-1 at 14, 16.

On June 12, 2019, Mr. Harker requested an interview with Plaintiff to discuss her alleged falsification of student records.  Dkt. 30 ¶ 4.  Defendant Butler, Ms. Sanford, and Mr. Pickens were also present at the interview.  Id.; Dkt. 31 ¶ 27; Dkt. 32 ¶ 4.  During the interview, Plaintiff admitted to falsifying a student's IEP by documenting that she had contacted the parent about an amendment to the IEP when she had not.  Dkt. 31 ¶ 27; Dkt. 32 ¶ 4; Dkt. 32-1 at 11.  When

---

[1] Plaintiff contends the notebooks removed by Defendant Butler contained data in addition to Styer data, such as social and behavioral data.  Dkt. 1 ¶ 4.68; Dkt. 57-1 at 58 (224:22–225:13).

asked about the data discrepancies in the Styer notebooks, Plaintiff could not explain why data was recorded on dates when either she and/or the student were not in school, and indicated she must have recorded the dates in error. Dkt. 31 ¶ 27; Dkt. 32 ¶ 4; Dkt. 32-1 at 14. She likewise could not explain why data had been recorded for student IEP goals that had not yet been created, stating it was possible she had written the wrong goals and had put in the data because she got "overwhelmed." Dkt. 32-1 at 14.

On June 13, 2019, Mr. Harker sent Defendant Butler a letter to deliver to Plaintiff notifying her that the District was placing her on administrative leave pending an investigation into her alleged falsification of student records. Dkt. 30 ¶ 5; Dkt. 30-1 at 2–3; Dkt. 31 ¶ 28. That same day, Mr. Harker also asked Ms. Sanford to review and investigate the allegations against Plaintiff, including Ms. Copeland's complaint and the concerns regarding the special education files for Plaintiff's students. Dkt. 30 ¶ 5; Dkt. 32 ¶ 6. Defendant Butler then evaluated Plaintiff's comprehensive job performance as "Level 1: Unsatisfactory." Dkt. 31 ¶ 28; Dkt. 31-2 at 7–11. In a rebuttal to her evaluation, Plaintiff attributed her low rating to discrimination by Defendant Butler. Dkt. 31 ¶ 28; Dkt. 31-2 at 15–16.

On June 19, 2019, Mr. Harker and Defendant Butler formally interviewed Ms. Copeland and Patty Bolinger, another paraprofessional in Plaintiff's classroom, about Plaintiff's data collection practices. Dkt. 32-1 at 14–16. When asked about Plaintiff's collection of academic data, both responded that, to their knowledge, no data was being collected. *Id.* Ms. Copeland reiterated that prior to spring break, the data sheets in the Styer notebooks had no data written on them, but following spring break, new data had appeared. *Id.* at 15. Ms. Bolinger corroborated this account. *Id.*

1    Defendant Butler left Defendant PASD shortly thereafter to start a new job with the

2    Northshore School District on July 1, 2019.  Dkt. 31 ¶ 28.

3        F.        Plaintiff's Discrimination Complaints

4        On September 6, 2019, Plaintiff filed a formal complaint with Defendant PASD, alleging

5    Defendant Butler, Defendant Reifenstahl, Ms. Blore, and Ms. Bolinger had discriminated against

6    her on the basis of her sexual orientation.  Dkt. 30 ¶ 6; Dkt. 30-1 at 5.  On September 9, 2019,

7    Ms. Sanford produced a draft report detailing the findings of her investigation into Plaintiff's

8    alleged falsification of student records, which highlighted several additional data discrepancies.

9    Dkt. 30 ¶ 7; Dkt. 32 ¶ 8; Dkt. 32-1 at 2–8.

10       On September 13, 2019, Mr. Harker met with Plaintiff and Ms. Pepper to discuss

11   Plaintiff's complaint against the District.  Dkt. 30 ¶ 6.  He also contacted Defendant PASD's

12   legal counsel, who arranged to hire an outside investigator to investigate Plaintiff's claims.[2]  *Id.*;

13   Dkt. 29 ¶ 3.  Subsequently, on or around September 19, 2019, Plaintiff filed a charge of

14   discrimination with the Seattle office of the Equal Employment Opportunity Commission

15   ("EEOC").  Dkt. 1 ¶ 4.78; Dkt. 29 ¶ 5.  On or around October 8, 2019, Defendant PASD

16   received a Notice of Charge of Discrimination from the EEOC.  Dkt. 30 ¶ 8; Dkt. 30-1 at 7–9.

17       G.        Plaintiff's Termination

18       On October 14, 2019, Ms. Sanford completed her final report.  Dkt. 32 ¶ 9; Dkt. 32-1 at

19   10–104.  The final report concluded that Plaintiff had falsified student records on multiple

20   occasions.  Dkt. 32 ¶ 9; Dkt. 32-1 at 16.  It also concluded that Plaintiff had committed

21   professional ethics violations.  Dkt. 32-1 at 16.  Ms. Sanford submitted her final report to Mr.

22

23       [2] The outside investigator, Chris Burton, drafted a report detailing his factual findings relative to
Plaintiff's complaint.  Dkt. 30 ¶ 9; Dkt. 30-1 at 11–31.  Based on the findings in Mr. Burton's report, Mr.
Harker determined Plaintiff's complaint lacked merit.  *See* Dkt. 49-1 at 2.

1    Harker and the District's Superintendent, Martin Brewer.  Dkt. 32 ¶ 9.  Based on his review of

2    the report, Mr. Brewer determined he had sufficiently reliable information to conclude that

3    Plaintiff had falsified student records.  Dkt. 29 ¶ 7.  Further, because he believed she had

4    committed acts of unprofessional conduct by falsifying student records in violation of

5    Washington law, on October 22, 2019, he referred charges against her to the Office of the

6    Superintendent of Public Instruction's Office of Professional Practices ("OPP"), as required by

7    state regulations.  *Id.* at ¶ 8; Dkt. 29-1 at 2–3; Dkt. 30 ¶ 10.  Subsequently, on February 18, 2020,

8    Mr. Brewer terminated Plaintiff's employment with the District.  Dkt. 29 ¶ 11; Dkt. 29-1 at 5–6.

9    Plaintiff initially appealed her termination, but ultimately dismissed her appeal.  *Id.* at ¶ 12.

10          In May 2020, OPP found insufficient evidence to conclude Plaintiff had violated the code

11   of professional conduct and dismissed the charges against her.  Dkt. 29 ¶ 13; Dkt. 29-1 at 8–9.

12   OPP based its finding, in part, on the fact that the data sheets Plaintiff had allegedly falsified

13   were not official IEP documents, and thus not student records.  Dkt. 29-1 at 9.

14          H.    Plaintiff's Lawsuit

15          On May 12, 2020, Plaintiff filed the present lawsuit against Defendants PASD, Butler,

16   and Reifenstahl, alleging (1) sex discrimination, and (2) retaliation in violation of Title VII of the

17   Civil Rights Act of 1964, ("Title VII"), 42 U.S.C. § 2000e *et seq.*; (3) sex discrimination, and (4)

18   retaliation in violation of the Washington Law Against Discrimination ("WLAD"), Chapter

19   49.60 RCW; (5) negligent supervision; and (6) defamation.  *See* Dkt. 1.  Plaintiff alleges

20   Defendants Butler and Reifenstahl discriminated against her on account of her sexual orientation,

21   including by ridiculing, harassing, and undermining her between school years 2016-17 and 2018-

22   19 and conspiring to push her out of her position with Defendant PASD.  *See generally id.*

23

1    Plaintiff further alleges Defendants Butler and PASD retaliated against Plaintiff for reporting

2    Defendant Butler's alleged discrimination.  *Id.*

3          After Plaintiff filed suit, Mr. Harker received a number of job reference emails from

4    school districts around Washington requesting that he respond to questions about Plaintiff's daily

5    work habits and asking whether he would rehire Plaintiff.  Dkt. 30 ¶ 12.  Mr. Harker alleges that

6    because he could not answer substantive questions about Plaintiff's teaching and believed he

7    would compromise her chances of getting a job if he answered other questions honestly, he chose

8    not to respond.  *Id.* at ¶ 13.  During the same time, Mr. Harker also received phone calls from

9    two school districts asking him whether he would rehire Plaintiff, and he responded that he

10   would not.  *Id.* at ¶ 14.

11         Defendants now move for summary judgment to dismiss all six of Plaintiff's claims.[3]

12   Dkt. 28.  By cross motion for partial summary judgment, Plaintiff moves to dismiss Defendants'

13   affirmative defenses.  Dkt. 35.

14                        III.    <u>DISCUSSION</u>

15   A.    <u>Legal Standard</u>

16         Summary judgment is appropriate where "the movant shows that there is no genuine

17   dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

18   R. Civ. P. 56(a).  Material facts are those which might affect the outcome of the suit under

19   governing law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In ruling on

20   summary judgment, a court does not weigh evidence to determine the truth of the matter, but

21

22

23         [3] Plaintiff has abandoned her negligent supervision and defamation claims.  *See* Dkt. 53 at 3.
     Accordingly, both claims should be dismissed with prejudice.  This Report and Recommendation
     addresses only Plaintiff's remaining claims.

1    "only determine[s] whether there is a genuine issue for trial." *Crane v. Conoco, Inc.*, 41 F.3d

2    547, 549 (9th Cir. 1994) (citation omitted).

3          The non-moving party must present significant and probative evidence to support its

4    claims or defenses. *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th

5    Cir. 1991) (citation omitted).  "The mere existence of a scintilla of evidence in support of the

6    [non-moving party's] position will be insufficient; there must be evidence on which the jury

7    could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 251.  Neither will

8    uncorroborated allegations and self-serving testimony create a genuine issue of material fact.

9    *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) (citation omitted).

10   Rather, the non-moving party must make a "sufficient showing on [each] essential element of her

11   case with respect to which she has the burden of proof" to survive summary judgment. *Celotex*

12   *Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

13         On summary judgment, the Court views the evidence in the light most favorable to the

14   non-moving party. *Anderson*, 477 U.S. at 255.  But where the non-moving party fails to properly

15   support an assertion of fact or fails to properly address the moving party's assertions of fact, the

16   Court will accept the fact as undisputed.  Fed. R. Civ. P. 56(e).  As such, the Court relies "on the

17   nonmoving party to identify with reasonable particularity the evidence that precludes summary

18   judgment." *Keenan v. Allan*, 91 F.3d 1275, 1278–79 (9th Cir. 1996) (cleaned up).  The Court

19   need not "comb the record to find some reason to deny a motion for summary judgment."

20   *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001) (citation

21   omitted).

22         / / /

23         / / /

1      B.      Plaintiff's Sex Discrimination Claims under Title VII and WLAD

2          Plaintiff brings a claim for sex discrimination under Title VII, alleging Defendants'

3  "hostile work environment and harassment of Plaintiff on the basis of her sexual orientation

4  constitutes sex discrimination" in violation of the statute.  Dkt. 1 ¶¶ 5.1–5.3.  Plaintiff also brings

5  a claim for sex discrimination under WLAD.  *Id.* at ¶¶ 7.1–7.3.

6          Both Title VII and WLAD prohibit discharge or discrimination in the terms or conditions

7  of employment because of sexual orientation.  42 U.S.C. § 2000e-2(a)(1); *Bostock v. Clayton

8  Cty.*, 140 S. Ct. 1731, 1754 (2020); RCW 49.60.030(1).  This prohibition gives rise to two types

9  of sex discrimination claims: (1) hostile work environment, and (2) disparate treatment.

10 Defendants construe Plaintiff's Complaint as stating both claims under both statutes.  *See* Dkt. 28

11 at 7–17.  Accordingly, the Court addresses Defendants' Motion on each claim under Title VII

12 and WLAD.

13      *1.      Hostile Work Environment*

14         Defendants move for summary judgment on Plaintiff's hostile work environment claims

15 under Title VII and WLAD, alleging Plaintiff cannot meet the prima facie elements. *See* Dkt. 28

16 at 8–12.  To prevail on a hostile work environment claim under both statutes,[4] Plaintiff must

17 demonstrate that (1) she was "subjected to verbal or physical conduct" because of her sexual

18 orientation, (2) "the conduct was unwelcome," and (3) "the conduct was sufficiently severe or

19 pervasive to alter the conditions of [her] employment and create an abusive work environment."

20 *Manatt v. Bank of Am., NA*, 339 F.3d 792, 798 (9th Cir. 2003) (citation omitted).  The Court

21 examines "all the circumstances" when determining whether conduct was sufficiently severe or

22 _____

23          [4] The Court's analysis of a hostile work environment claim is substantially the same under Title VII and WLAD.  *Dawud v. Boeing Co.*, No. C17-1254-JCC, 2018 WL 4735703, at *6 (W.D. Wash. Oct. 2, 2018) (citing *Antonius v. King Cty.*, 153 Wn.2d 256, 269–70, 103 P.3d 729 (2004)).  The Court therefore considers Plaintiff's claims under federal law.

1    pervasive, including "the frequency of the discriminatory conduct; its severity; whether it is

2    physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably

3    interferes with an employee's work performance." *Davis v. Team Elec. Co.*, 520 F.3d 1080,

4    1095 (9th Cir. 2008) (citation omitted).  The environment must be both subjectively and

5    objectively abusive.  *Vasquez v. Cty. of Los Angeles*, 349 F.3d 634, 642 (9th Cir. 2003) (citation

6    omitted).  "Simple teasing, offhand comments, and isolated incidents (unless extremely serious)

7    will not amount to discriminatory changes in the 'terms and conditions of employment.'"

8    *Manatt*, 339 F.3d at 798 (cleaned up).

9         Plaintiff, in opposing Defendants' Motion, does not address the showing necessary for

10   her to maintain a hostile work environment claim.  She does, however, recount specific instances

11   in which she alleges (1) Defendants Butler and Reifenstahl undermined her; ignored her and/or

12   Ms. Pepper; and looked at them with contempt, disgust, and disdain, Dkt. 43 at 4–5, 7, 8, 10, 14,

13   15, 18; and (2) Defendant Butler, Defendant Reifenstahl, and Ms. Blore made comments she

14   considered discriminatory.  For example, Plaintiff points to Defendant Butler (1) telling her to

15   "watch it," *id.* at 5; (2) asking her if Ms. Pepper was "someone new," Dkt. 57-1 at 21–22 (76:22–

16   78:13); (3) telling her to "get out" of teaching special education, Dkt. 43 at 6; (4) telling her she

17   was "so pissed" at her, *id.* at 10; and (5) announcing that Plaintiff was not scheduled for teacher

18   evaluations in front of other staff, *id.* at 18.  She also points to Defendant Reifenstahl telling her

19   that her holiday celebrations were "untraditional," Dkt. 57-1 at 13 (44:19–45:6), and Ms. Blore

20   asking her if she liked rainbows, Dkt. 43 at 13.

21        These facts, construed in Plaintiff's favor, fail to establish a claim for hostile work

22   environment.  The U.S. Supreme Court has held that Title VII does not set forth "a general

23   civility code for the American workplace."  *Oncale v. Sundowner Offshore Services, Inc.*, 523

1    U.S. 75, 80 (1998); *see also Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (citing

2    *Oncale*, 523 U.S. at 80). "[P]ersonality conflicts at work that generate antipathy" and "snubbing

3    by supervisors and co-workers" are not actionable under the statute. *Burlington N. & Santa Fe*

4    *Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (citation omitted). Plaintiff alleges Defendants Butler

5    and Reifenstahl were rude to her, undermined her authority, and looked at her with contempt. As

6    held by numerous courts, however, these allegations do not rise to the level of a hostile work

7    environment. *See, e.g.*, *Quarless v. Bronx Leb. Hosp. Ctr.*, 75 Fed. App'x. 846, 848 (2d Cir.

8    2003) (cleaned up) (upholding district court's dismissal of hostile work environment claim based

9    on plaintiff's allegations that he was "shunned, kept away from meetings he usually attended,

10   and his authority was undermined" because none of the allegations constituted "pervasive

11   discriminatory intimidation, ridicule, and insult"); *Patterson v. Johnson*, 391 F. Supp. 2d 140,

12   146 (D.D.C. 2005), *aff'd*, 505 F.3d 1296 (D.C. Cir. 2007) (alleged incidents in which plaintiff's

13   authority was "undermined" did not rise to the level of a hostile work environment); *Miller v.*

14   *Aluminum Co. of Am.*, 679 F. Supp. 495, 503 (W.D. Pa. 1988), *aff'd*, 856 F.2d 184 (3d Cir. 1988)

15   ("snubbing" and unjust criticisms by supervisors do not amount to an actionable hostile work

16   environment); *Bergin v. N. Clackamas Sch. Dist.*, Civ. No. 03–1412, 2005 WL 66069, at * 19

17   (D. Or. Jan. 12, 2005) ("shunning and humiliation" by co-workers, though "pervasive and

18   continuous," was not sufficient to support a hostile work environment claim).

19        Plaintiff's other allegations similarly fail to support a claim for hostile work environment.

20   Ninth Circuit case law establishes a high burden for finding a hostile work environment. *Dawud*,

21   2018 WL 4735703, at *6 (citing *Manatt*, 339 F.3d at 798–99). For example, in *Sanchez v. City*

22   *of Santa Ana*, 936 F.2d 1027, 1031–32, 37 (9th Cir. 1990), the Ninth Circuit affirmed the district

23   court's dismissal of the plaintiff's hostile work environment claim, despite the plaintiff's

1  allegations that the employer posted a racially offensive cartoon, made racially offensive slurs,

2  targeted Latinos when enforcing rules, provided unsafe vehicles to Latinos, did not provide

3  adequate police backup to Latino officers, and kept illegal personnel files on plaintiffs because

4  they were Latino.  Similarly, in *Kortan v. Cal. Youth Auth.*, 217 F.3d 1104, 1106–07 (9th Cir.

5  2000), the Ninth Circuit determined there was no hostile work environment when a supervisor

6  called female employees "castrating bitches," "Madonnas," or "Regina" on several occasions in

7  the plaintiff's presence; the supervisor called the plaintiff "Medea"; and the plaintiff had other

8  difficulties with that supervisor.

9      By contrast, in *Draper v. Coeur Rochester, Inc.*, 147 F.3d 1104, 1105–06 (9th Cir. 1998),

10  the Ninth Circuit found a hostile work environment where the plaintiff's supervisor made

11  repeated sexual remarks about the plaintiff over a two-year period, called her "gorgeous" and

12  "beautiful" rather than her name, told her about his sexual fantasies and his desire to have sex

13  with her, commented on her "ass," and asked over a loudspeaker if she needed help changing

14  clothes.  In *Nichols v. Azteca Rest. Enterprises, Inc.*, 256 F.3d 864, 872–75 (9th Cir. 2001), the

15  Ninth Circuit likewise recognized a hostile work environment when a male employee of the

16  restaurant was subjected to relentless insults, name-calling, vulgarities, and taunts of "faggot"

17  and "fucking female whore" by male coworkers and supervisors at least once a week and often

18  several times a day.

19      The circumstances here fall well short of even those found insufficient in *Sanchez* and

20  *Kortan*.  Many of the comments Plaintiff has identified as hostile and discriminatory in nature—

21  such as Defendant Butler telling Plaintiff to "get out" of teaching special education, telling her

22  she was "so pissed" at her, and announcing that Plaintiff was not scheduled for teacher

23  evaluations—objectively did not pertain to Plaintiff's sexual orientation.  Further, the few

1   comments that arguably did—such as Defendant Butler telling Plaintiff to "watch it," Defendant

2   Reifenstahl calling her holiday celebrations "untraditional," and Ms. Blore asking Plaintiff if she

3   liked rainbows—were isolated, sporadic, and ambiguous in nature.  Even assuming they were

4   motivated by unlawful discrimination, such offhand, disparate comments, spread out over a

5   period of three years, do not amount to the type of "severe and pervasive" harassment necessary

6   to maintain a claim for hostile work environment.  *See Manatt*, 339 F.3d at 798–99.  Defendant's

7   Motion as to Plaintiff's hostile work environment claims under Title VII and WLAD should be

8   granted.

9           2.      *Disparate Treatment*

10                  a.      *Legal Framework*

11          Under Title VII and WLAD, a person suffers disparate treatment in employment "when

12   he or she is singled out and treated less favorably than others similarly situated" because of his or

13   her membership in a protected class.  *Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018,

14   1028 (9th Cir. 2006) (cleaned up).  Under Title VII, discrimination must be a "but for" cause of

15   the person's disparate treatment.  *Bostock*, 140 S. Ct. at 1739 (citation omitted).  Under WLAD,

16   discrimination need only be a "substantial factor" in the disparate treatment.  *Marquis v. City of

17   Spokane*, 130 Wn.2d 97, 114, 922 P.2d 43 (1996) (citation omitted).  Because there is rarely

18   direct evidence of discrimination, disparate treatment claims under both statutes are often

19   considered under the burden-shifting framework set forth in *McDonnell Douglas Corp. v.

20   Green*, 411 U.S. 792 (1973).  *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 252–53

21   (1981); *Mikkelsen v. Pub. Util. Dist. No. 1 of Kittitas Cnty.*, 189 Wn.2d 516, 526–27, 404 P.3d

22

23

464 (2017) (applying *McDonnell Douglas* framework to claims under WLAD).[5]  Both parties

apply this standard when analyzing Plaintiff's disparate treatment claims.  *See* Dkt. 28 at 13; Dkt.

43 at 22.

Under *McDonnell Douglas*, a plaintiff bears the initial burden of establishing a prima

facie case by raising an inference of discrimination—a "presumption that the employer

unlawfully discriminated against the employee." *Burdine*, 450 U.S. at 254.  "If the plaintiff

establishes a prima facie case, the burden then shifts to the defendant to articulate a legitimate

nondiscriminatory reason for its employment decision." *Wallis v. J.R. Simplot Co.*, 26 F.3d 885,

889 (9th Cir. 1994) (citation omitted).  If the defendant succeeds, then to defeat summary

judgment, the plaintiff must demonstrate that the "articulated reason is a pretext for unlawful

discrimination by either directly persuading the court that a discriminatory reason more likely

motivated the employer or indirectly by showing that the employer's proffered explanation is

unworthy of credence." *Aragon v. Republic Silver State Disposal, Ind.*, 292 F.3d 654, 658–59

(9th Cir. 2002) (cleaned up).

　　　　　　　b.　　*Prima Facie Case*

Defendants move for summary judgment on Plaintiff's disparate treatment claims,

alleging Plaintiff cannot satisfy the prima facie elements, and even if she could, she was

terminated for the legitimate nondiscriminatory reason that she falsified student records.  *See*

Dkt. 28 at 14–17.

To establish a prima facie case of disparate treatment, Plaintiff must show (1) she is a

member of a protected class, (2) she performed her job satisfactorily, (3) she suffered an adverse

---

[5] Because Washington courts look to federal law in interpreting disparate treatment claims under WLAD, *see Mikkelsen*, 189 Wn.2d at 528–32, the Court will consider Defendants' Motion under federal law, looking to Washington case law where appropriate.

1    employment action, and (4) Defendants treated her differently from other similarly situated

2    employees who do not belong to the same protected class.  *Cornwell*, 439 F.3d at 1028 (citing

3    *McDonnell Douglas Corp.*, 411 U.S. at 802).  Alternatively, instead of providing comparator

4    evidence of a "similarly situated" employee, Plaintiff may provide evidence of "other

5    circumstances surrounding the adverse employment action" that give rise to an inference of

6    discrimination.  *Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 603 (9th Cir. 2004) (citation

7    omitted).  The amount of evidence Plaintiff must produce is "very little," *Chuang v. Univ. of Cal.*

8    *Davis*, 225 F.3d 1115, 1124 (9th Cir. 2000), so long as it is more than "purely conclusory

9    allegations of alleged discrimination, with no concrete, relevant particulars." *Forsberg v. Pac.*

10   *Northwest Bell Tel. Co.*, 840 F.2d 1409, 1419 (9th Cir. 1988) (citation omitted).

11         Defendants do not dispute that Plaintiff has satisfied the first and third elements of her

12   prima facie case.  She is a lesbian and a member of a protected class on the basis of her sexual

13   orientation.  *See* Dkt. 1 ¶ 4.7.  Further, Defendants concede that Plaintiff suffered an adverse

14   employment action when the District terminated her employment.[6]  Defendants argue, however,

15   that Plaintiff cannot satisfy her prima facie burden on the second and fourth elements because (1)

16   she was found to have falsified student records, so was not performing her job satisfactorily; and

17   (2) she cannot identify a similarly situated employee because no other employee in the District

18   has ever been found to have committed similar misconduct.  Dkt. 28 at 14–15.  Thus, there is

19   significant overlap between Defendants' challenge to Plaintiff's prima facie case and their

20   legitimate nondiscriminatory reason for her discharge—i.e., that she falsified student records.

21   _____

22        [6] In opposing Defendant's Motion, Plaintiff identifies only her termination as the adverse
     employment action at issue for the purpose of her disparate treatment claims, Dkt. 43 at 22–25, and the
23   Court's analysis proceeds accordingly.  The Court construes other potential adverse employment actions
     Plaintiff may have alleged, such as being placed on a PIP or receiving negative performance evaluations,
     as possible evidence giving rise to an inference of discrimination.  The Court expresses no opinion on
     whether these other potential adverse employment actions qualify as such under Title VII or WLAD.

Typically, courts first determine whether a plaintiff has established a prima facie case before requiring employers to demonstrate a legitimate nondiscriminatory reason for their conduct and engaging in the pretext analysis. *Everroad v. Scott Truck Sys., Inc.*, 604 F.3d 471, 477 (7th Cir. 2010) (citing *Hague v. Thompson Distribution Co.*, 436 F.3d 816, 823 (7th Cir. 2006)). In some cases, however, the issue of satisfactory performance and the question of pretext overlap. *Id.* at 477–78 (citation omitted) (providing that when the employer's nondiscriminatory reason for termination is that the employee was not meeting legitimate job expectations, the "credibility of the employer's assertion is at issue for both the second element of the plaintiff's prima facie case and the pretext analysis"). In such instances, courts can skip over the *McDonnell Douglas* initial burden-shifting framework and focus on the question of pretext. *Id.*; *Hague*, 436 F.3d at 823; *see also Volochayev v. Sebelius*, 513 F. App'x 348, 353 (4th Cir. 2013) (recognizing that when using *McDonnell Douglas*, courts can, but are not required to, merge their analysis of whether an employee was performing satisfactorily with their pretext analysis).

The Court does so here by assuming, without deciding, that Plaintiff has satisfied her prima facie burden.[7] Because Defendants contend they terminated Plaintiff for falsifying student

---

[7] Plaintiff provides little to no legal argument in response to Defendants' challenge to her prima facie case and does little to assist the Court in determining whether she has met her burden. Even so, Defendants' stated challenge to the second element of her case is arguably insufficient. While the Ninth Circuit requires proof of satisfactory job performance as the second element, such proof need not include a "flawless personnel file" at all times during employment. *Bahri v. Home Depot USA, Inc.*, 242 F. Supp. 2d 922, 931 (D. Or. 2002). "It would be fundamentally unfair to require plaintiffs to show that their employment files were devoid of negative reviews and write ups after illegal discrimination was interjected into their workplace particularly where, as here, plaintiffs allege that the discrimination manifested itself in unjustified warnings and unjustifiably low performance evaluation rankings." *Id.* In other words, "the second element of the prima facie case makes sense only when it is limited to the time period prior to the introduction of the alleged unlawful discrimination." *Id.* Under this standard, Plaintiff need only establish that she was performing her job satisfactorily prior to her first allegations of unlawful discrimination in 2016. Because Plaintiff received positive performance evaluations through school year 2016-17, she can likely do so. *See also Creekmore v. U.S. Bank, N.A.*, No. C09-561-RAJ, 2010 WL

records, the burden now shifts to Plaintiff to establish that this legitimate nondiscriminatory

reason is actually a pretext.

          c.    *Pretext*

A plaintiff can demonstrate that the defendant's legitimate nondiscriminatory reason for

taking an adverse employment action is actually a pretext by showing (1) "that the employer's

proffered explanation is unworthy of credence," or (2) "that a discriminatory reason more likely

motivated the employer." *Burdine*, 450 U.S. at 256 (citation omitted).  A plaintiff may rely on

direct evidence which proves discriminatory animus on its own—typically "clearly sexist, racist,

or similarly discriminatory statements or actions by the employer"—or circumstantial evidence,

which "requires an additional inferential step to demonstrate discrimination." *Coghlan v.*

*American Seafoods Co. LLC*, 413 F.3d 1090, 1095 (9th Cir. 2005) (citation omitted).  "Very

little" direct evidence of a discriminatory motive is sufficient.  *Winarto v. Toshiba America*

*Elecs. Components, Inc.*, 274 F.3d 1276, 1284 (9th Cir. 2001) (citation omitted).  Where

circumstantial evidence is used, however, "a plaintiff must put forward specific and substantial

---

3211925, at *3 (W.D. Wash. Aug. 12, 2010) (citation omitted) ("The plaintiff's minimal burden in
proving a prima facie case means that the employer's stated basis for termination is usually insufficient to
overcome evidence that the employee was performing satisfactorily.").

    This same reasoning applies to Plaintiff's alleged inability to identify a similarly situated
employee.  Similarly situated employees in this context must be similar to the plaintiff "in all material
respects." *Moran v. Selig*, 447 F.3d 748, 755 (9th Cir. 2006) (citations omitted).  Although material
characteristics vary from case to case, in termination and discipline cases, the Ninth Circuit looks to
factors such as whether the proposed comparator and the plaintiff were subject to the same policies,
worked at the same jobs, committed similar violations, and had similar disciplinary records. *See, e.g.*,
*Vasquez*, 349 F.3d at 641 (9th Cir. 2003) (similar jobs and similar type and severity of misconduct); *Wall
v. Nat'l R.R. Passenger Corp.*, 718 F.2d 906, 909 (9th Cir. 1983) (similar conduct and disciplinary
records).  But it would be unreasonable to expect Plaintiff to identify an employee with similar allegations
of misconduct when she contends that, in her case, the allegations are themselves evidence of
discrimination.  With that in mind, any difficulty Plaintiff might have in identifying a similarly situated
employee is significantly lessened.

evidence challenging the credibility of the employer's motives." *Vasquez*, 349 F.3d at 641 (9th Cir. 2003) (citations omitted).

        i.     *Whether Defendants' Proffered Reason is Unworthy of Credence*

In attempting to establish that Defendants' legitimate nondiscriminatory reason for her termination is a pretext, Plaintiff argues it is unworthy of credence because (1) OPP determined the "falsified" student data sheets were not student records; (2) regardless, she did not falsify the data sheets; and (3) she did not falsify the relevant student IEP because she changed it at Defendant Butler's direction and the IEP already provided for the change she made. Dkt. 43 at 24. Plaintiff's arguments are unpersuasive. While it is true that OPP dismissed the charges against her, that is immaterial to proving pretext here. OPP did not determine that Plaintiff did not falsify the student data in question. Instead, it determined that the data did not qualify as "student records" for the purpose of finding a professional conduct violation. Dkt. 29-1 at 9. Further, Defendants did not terminate Plaintiff solely because they believed the student data qualified as student records, but because they believed she behaved dishonestly in falsifying the data. Dkt. 29 ¶ 11. Plaintiff has come forth with no evidence indicating that this belief was not legitimately held. *See Villiarimo*, 281 F.3d at 1063 (cleaned up) ("[C]ourts only require that an employer honestly believed its reason for its actions, even if its reason is foolish or trivial or even baseless."); *Stewart v. Henderson*, 207 F.3d 374, 378 (7th Cir. 2000) (citation omitted) ("The focus of a pretext inquiry is whether the employer's stated reason was honest, not whether it was accurate, wise, or well-considered.").

Moreover, Plaintiff points to no evidence to support her assertion that she did not falsify the data in question, whereas Defendants have come forward with evidence indicating she did. *See* Dkt. 32-1 at 10–104. At her deposition, Plaintiff testified that Defendants found data

1    recorded on dates when either Plaintiff and/or the student were not in school because the dates in

2    the notebooks corresponded with the dates on which she recorded the data, and not necessarily

3    the dates on which she collected it.  Dkt. 57-1 at 60 (231:11–23).  But notably, Plaintiff did not

4    provide Defendants with this explanation during their investigation into her alleged misconduct,

5    nor could she explain the alleged data inconsistencies at that time.  Dkt. 31 ¶ 27; Dkt. 32 ¶ 4;

6    Dkt. 32-1 at 14.  Instead, she indicated that the dates in question did not match either her or the

7    students' attendance records because she "had the wrong date" or made an "error."  Dkt. 32-1 at

8    14.

9         Further, this explanation fails to account for the fact that, following spring break, Ms.

10   Copeland noticed entirely new data, backdated to September 2018, had been entered into the

11   Styer notebooks.  Dkt. 31 ¶ 25; Dkt. 50-4 at 2–3.  While Plaintiff now attempts to explain this

12   anomaly by positing that Ms. Copeland was looking for Styer data in notebooks for students who

13   were not participating in the Styer curriculum, Dkt. 57-1 at 60 (230:6–231:5), this fails to address

14   or refute the material point—that new data appeared where there previously had been none.  It

15   likewise does not account for additional data discrepancies discovered by Ms. Sanford, including

16   data that had been recorded for student IEP goals which had not yet been written and data

17   unrelated to the IEP goals of the students for whom it was allegedly collected. Dkt. 32 ¶ 3; Dkt.

18   32-1 at 14.

19        Finally, Plaintiff's contention that she did not falsify the relevant student IEP is not

20   supported by the evidence.  Plaintiff previously admitted to doing so, Dkt. 32-1 at 11, and while

21   she now alleges the IEP already provided for the change she made and that she changed it at

22

23

1   Defendant Butler's direction, Dkt. 43 at 24, she cites no evidence to support either conclusion.[8]

2   Thus, Plaintiff has failed to show pretext by demonstrating that Defendants' proffered reason for

3   her termination is unworthy of credence.

ii.   *Whether a Discriminatory Reason More Likely Motivated*
      *Defendants*

5          Plaintiff likewise fails to establish pretext by demonstrating that a discriminatory reason

6   more likely motivated her termination.  Plaintiff's disparate treatment claim is predicated on

7   allegations that Defendant Butler discriminated against her on account of her sexual orientation

8   and conspired with District staff, including Defendant Reifenstahl, to "drive Plaintiff from the

9   school."  *See* Dkt. 43 at 15.  But because Defendant Butler provided Plaintiff with positive

10  performance evaluations through school year 2016-17—after Plaintiff alleges the discrimination

11  began, Dkt. 31 ¶ 15; Dkt. 46-1 at 9–10—a strong inference arises that Defendant Butler had no

12  discriminatory motive.

1.   *"Same Actor" Inference*

14         The Ninth Circuit has held that when the same actor is responsible for both favorable and

15  unfavorable actions toward a discrimination plaintiff within a short period of time, a "strong

16  inference" arises that the actor had no discriminatory motive when acting unfavorably.  *See*

17  *Bradley v. Harcourt, Brace & Co.*, 104 F.3d 267, 270–71 (9th Cir. 1996) (citations omitted);

18  *Coghlan*, 413 F.3d at 1096.  This "same actor inference" is "neither a mandatory presumption

19  (on one hand) nor a mere possible conclusion for the jury to draw (on the other).  Rather, it is a

20  'strong inference' that a court must take into account on a summary judgment motion."

---

[8] Moreover, the relevant question is not whether Plaintiff made the change and at whose direction, but whether she first contacted the parent about the IEP amendment in the manner she alleged. *See* Dkt. 32-1 at 11.  Plaintiff does not dispute that she did not.

REPORT AND RECOMMENDATION - 27

1    *Coghlan*, 413 F.3d at 1098 (citation omitted).  In doing so, a court must consider "whether [a

2    plaintiff] has made out the strong case of bias necessary to overcome this inference."  *Id.*

3            The Court concludes that Plaintiff has not.[9]  Plaintiff alleges Defendant Butler

4    discriminated against her in numerous ways, including by subjecting her to ever-changing

5    teaching expectations, requiring her to meet regularly and provide Defendant Butler with lesson

6    plans, placing her on a PIP, and giving her negative performance evaluations—none of which

7    heterosexual teachers were subjected to.  Dkt. 43 at 12–13, 16–17, 20.  But Defendants have

8    offered evidence indicating Plaintiff demonstrated repeated performance issues and was placed

9    on a PIP—which required her to meet regularly with Defendant Butler and provide Defendant

10   Butler with lesson plans—to address those issues.  Dkt. 47 at 47 (181:20–182:5).  Similarly,

11   Defendants have presented evidence indicating Plaintiff's negative performance evaluations

12   resulted from her poor performance.  *See* Dkt. 31 ¶¶ 16–28; Dkt. 33 ¶¶ 6–13.  Plaintiff, on the

13   other hand, presents no evidence from which the Court can conclude that either Defendants'

14   measures to improve Plaintiff's performance or her negative performance evaluations were

15   unwarranted.

16

17

18           [9] While the same actor inference does not apply to Defendant Reifenstahl, Plaintiff's allegations
     against her are insufficient to find that a discriminatory reason more likely motivated the District's
19   decision to terminate Plaintiff because (among other reasons) Plaintiff does not allege Defendant
     Reifenstahl in any way influenced or was involved in her termination.  While Plaintiff alleges Defendant
20   Butler conspired with Defendant Reifenstahl to push Plaintiff from the school, meaning Plaintiff's
     allegations against Defendant Reifenstahl could be construed as further evidence of Defendant Butler's
21   discriminatory intent, Plaintiff fails to provide evidence supporting the conspiracy she alleges.  For
     example, she alleges Defendant Butler "discussed student needs with Ms. Reifenstahl, who complained to
22   her about Plaintiff, and excluded Plaintiff from those discussions."  Dkt. 43 at 15.  She further alleges that
     "[a]s a result of Ms. Reifenstahl's complaints to Ms. Butler about Plaintiff, Ms. Butler sent Ms. Davis to a
23   remedial course for paraprofessionals," and that "Ms. Butler was trying to drive Plaintiff out, and her
     friend Ms. Reifenstahl was in on the plot as they worked together to undermine Plaintiff for no other
     reason than that she exhibited her gay relationship openly at school."  *Id.*  She cites nothing to support
     these assertions.

1       For example, Defendants have come forth with evidence indicating Plaintiff failed to

2 implement the Styer curriculum in accordance with the District's expectations.  Dkt. 31 ¶¶ 20–

3 21, 24–25; Dkt. 33 ¶¶ 6–10.  Plaintiff contends Defendant Butler never instructed her to

4 implement Styer, and that "whether to implement the materials and with what student was solely

5 Plaintiff's province."  Dkt. 43 at 20.  While it is true that Plaintiff was only required to

6 implement Styer with students who she determined would benefit from it, Dkt. 31-2 at 3,

7 Plaintiff does not dispute that a necessary part of making that determination was first conducting

8 an initial assessment of all her students.  *See* Dkt. 48 at 38 (148:8–14).  Defendants have

9 submitted evidence indicating Plaintiff never completed the initial assessments during the 2016-

10 17 school year, Dkt. 33 ¶ 9, as well as evidence indicating that while she completed more initial

11 assessments during the 2017-18 school year, those assessments were irregular and inaccurate.

12 *Id.* at ¶ 10.  Plaintiff fails to address or refute either point.  Further, Plaintiff herself indicates she

13 was using Styer with five of her students during the 2017-18 school year.  Dkt. 31-1 at 19–20.

14 But Defendants have come forth with evidence indicating Plaintiff failed to collect or record data

15 in the Styer notebooks during that time, Dkt. 31 ¶ 21; Dkt. 33 ¶ 10; Dkt. 47 at 20 (75:24–76:23),

16 which Plaintiff does not refute.

17       Similarly, while Plaintiff contends she incorporated Defendant Butler's "ever-expanding

18 new list of work items" without complaint and that her efforts were "never enough" for

19 Defendant Butler, Dkt. 43 at 16; Dkt. 44 ¶ 1, she offers insufficient evidence to support this

20 conclusion.  While Plaintiff has produced evidence indicating Defendant Butler asked her to

21 implement changes to her classroom on different occasions, Dkt. 44 ¶ 1, she points to no

22 evidence, other than her subjective opinion, indicating these requested changes were

23 unwarranted based on her performance or that she properly implemented them.  In assessing

1    whether an employee was satisfactorily performing his or her work, the employee "must produce

2    evidence, not just pleadings or argument." *Weil v. Citizens Telecom Servs. Co., LLC*, 922 F.3d

3    993, 1003 (9th Cir. 2019).  In other words, "[a]n employee's self-assessment of his performance,

4    though relevant, is not enough on its own to raise a genuine issue of material fact." *Id.* (citation

5    omitted); *see also Bradley*, 104 F.3d at 270 (citation omitted) ("[A]n employee's subjective

6    personal judgments of her competence alone do not raise a genuine issue of material fact").

7    While Plaintiff points to Ms. Blore's conclusion that she had prepared for the 2018-19 school

8    year in accordance with expectations, Dkt. 43 at 13; Dkt. 44 ¶ 2, she offers no other evidence

9    from which the Court can conclude that she continued meeting expectations.

10    For example, she alleges she produced documentation evidencing her efforts to

11    Defendant Butler, which Defendant Butler refused to consider, Dkt. 43 at 16–17, but has not

12    provided any such documentation to the Court.  Similarly, she has not provided testimony from

13    any other teachers or staff speaking to her efforts or success in implementing Defendant Butler's

14    requested changes.  From Plaintiff's evidence, the Court can conclude, at most, that Plaintiff

15    tried to implement the requested changes, but not that she successfully did so.  Given this, it

16    cannot conclude that Plaintiff's negative performance evaluations were unwarranted.

17    Plaintiff argues Defendant Butler required her to stay on campus during contract hours,

18    but did not require this of heterosexual teachers.  Dkt. 43 at 12.  Plaintiff acknowledges,

19    however, that it was "absolutely possible" other staff were leaving early for preapproved

20    commitments and that she did not know what those commitments might be.  Dkt. 57-1 at 45–46

21    (173:25–177:23).  Plaintiff similarly contends Defendant Butler required her to have her visitors

22    sign in at the office, Dkt. 43 at 17, but admits having visitors sign in was a school policy that Ms.

23    Pepper often failed to comply with.  Dkt. 57-1 at 34 (126:18–129:8).  Further, she presents no

1    evidence indicating heterosexual teachers were not also made to comply with this policy, nor

2    does she contend they were not.

3         Plaintiff argues Defendant Butler withheld resources from her, including by refusing to

4    provide her with a one-on-one paraprofessional for a student in her classroom whose IEP

5    required one.  Dkt. 43 at 10.  But Defendant Butler testified that Defendant Reifenstahl was

6    assigned to be the student's one-on-one paraprofessional, Dkt. 47 at 28 (106:4–108:1), which

7    Plaintiff does not refute.  Plaintiff further argues that while she "was allowed only from one to

8    three paraprofessionals as support staff," Ms. Richardson "typically had five to eight

9    paraprofessionals in her classroom."  Dkt. 43 at 10.  At no time, however, did Plaintiff testify

10   that Ms. Richardson had eight paraprofessionals, and Ms. Richardson testified that she never had

11   more than six.  Dkt. 48 at 8 (25:19–26:16).  Further, Plaintiff admits that during the time frame in

12   question, she herself had four.  Dkt. 57-1 at 38 (144:7–14).  Finally, Defendant Butler and Ms.

13   Richardson testified that the number of paraprofessionals assigned to each classroom depended

14   on the documented needs of the students, Dkt. 47 at 57–58 (224:10–227:16); Dkt. 33 ¶ 14, which

15   Plaintiff does not refute.  Yet, she offers no evidence from which the Court can conclude that the

16   documented needs of her students required more paraprofessionals than she received.

17        Plaintiff alleges Ms. Richardson told her that she knew the "administration" was trying to

18   railroad Plaintiff.  Dkt. 43 at 9.  Ms. Richardson does not corroborate Plaintiff's account, Dkt. 48

19   at 36 (139:10–25), but assuming she did, Plaintiff has presented no evidence indicating Ms.

20   Richardson attributed the railroading to Plaintiff's sexual orientation.  Further, Ms. Richardson

21   testified that she never witnessed Defendant Butler or anyone else treat Plaintiff differently on

22   account of her sexual orientation.  Dkt. 33 ¶ 15.  From this, the Court cannot infer that Ms.

23

1    Richardson intended to convey that the administration was railroading Plaintiff for

2    discriminatory reasons.

3         Plaintiff points to other instances she alleges evidence Defendant Butler's discriminatory

4    intent, including that Defendant Butler placed a first-grade student in Ms. Richardson's class

5    instead of Plaintiff's, Dkt. 43 at 16; referred to Ms. Richardson as the "preferred standard for

6    teaching special education," *id.* at 6; did not ask Plaintiff for input on paraprofessional

7    evaluations, *id.* at 11; modified Plaintiff's IEPs and refused to timely sign an IEP, *id.* at 13–14;

8    failed to purchase a reading program for Plaintiff, *id.* at 18; and generally ignored Plaintiff and

9    was rude to her, *see generally id*.  Without more, these allegations are insufficient indicators of

10    bias to overcome the strong inference that Defendant Butler was not intending to discriminate.

11    They therefore fail to show that Defendants were more likely motivated by a discriminatory

12    reason when terminating Plaintiff and do not establish pretext.

13                    *2.    Defendant PASD's Independent Investigation*

14         Even if Plaintiff had overcome the "same actor" inference, her disparate treatment claims

15    would still fail because Defendant PASD only decided to terminate Plaintiff after conducting its

16    own independent investigation into her alleged misconduct.  In other words, Defendant Butler's

17    presumed discriminatory bias was not a factor in Defendant PASD's decision.

18         If an adverse employment action is the consequence of an entirely independent

19    investigation by an employer, the animus of the discriminating employee is not imputed to the

20    employer.  *Poland v. Chertoff*, 494 F.3d 1174, 1183 (9th Cir. 2007) (citation omitted).  If,

21    however, a discriminating subordinate sets in motion a proceeding by an independent

22    decisionmaker that leads to an adverse employment action, the subordinate's bias is imputed to

23    the employer if the plaintiff can prove that the allegedly independent adverse employment

1   decision was not actually independent because the biased subordinate influenced or was involved

2   in the decision. *Id.* at 1182.

3        *In Poland*, 494 F.3d at 1183–84, the Ninth Circuit held that while the initiation of an

4   investigation would not "on its own" be enough to impute a subordinate's animus, the biased

5   subordinate had such a "pervasive influence on the administrative inquiry that led to the adverse

6   employment action" that the investigation could not immunize the employer from liability.  In

7   that case, the supervisor specifically requested the investigation, sent a lengthy memo and

8   supporting documentation outlining numerous incidents of the plaintiff's alleged misconduct,

9   and provided the list of the twenty-one witnesses who were contacted during the investigation.

10   *Id*. at 1183.

11        By contrast, in *Lakeside-Scott v. Multnomah Cty.*, 556 F.3d 797, 807 (9th Cir. 2009), the

12   Ninth Circuit held that while the initial report of possible employee misconduct came from a

13   presumably biased supervisor, the supervisor's subsequent involvement in the disciplinary

14   process was so minimal that it negated any inference that the investigation and final termination

15   were biased.  In that case, the supervisor was engaged in activities "typical and appropriate for

16   her position" when she became aware of the alleged misconduct.  *Id.* at 805.  After she reported

17   the misconduct to her superior, the superior decided to place the employee in question on

18   administrative leave and directed the supervisor to inform the employee.  *Id.* at 801.  The

19   superior then directed an investigator to investigate the allegations against the employee, which

20   the investigator did without any significant participation from the supervisor.  *Id.*  Finally, it was

21   the superior, and not the supervisor, who decided to terminate the employee after reviewing the

22   findings of the investigation.  *Id.* at 801–02.

23

Here, as in *Lakeside-Scott*, Defendant Butler initially reported her concerns regarding Plaintiff's alleged data falsification to Mr. Harker; however, she only did so after Ms. Copeland reported the same to Defendant Butler—which was "typical and appropriate" given Defendant Butler's position as principal. Dkt. 31 ¶ 25. Following Defendant Butler's report of the same to Mr. Harker, Mr. Harker advised Defendant Butler to retrieve the data notebooks from Plaintiff's classroom, Dkt. 31 ¶ 26; Dkt. 47 at 50 (193:9–12), and similarly instructed her to ask Ms. Sanford to review them and investigate Ms. Copeland's allegations. Dkt. 30 ¶ 3. Mr. Harker, and not Defendant Butler, decided to place Plaintiff on administrative leave pending Ms. Sanford's investigation. *Id.* at ¶ 5. Further, the evidence indicates Ms. Sanford conducted her investigation independently of Defendant Butler. While Defendant Butler was present when Mr. Harker and Ms. Sanford interviewed Plaintiff, Dkt. 31 ¶ 27, Ms. Sanford's final report indicates that she, and not Defendant Butler, questioned Plaintiff during the interview, Dkt. 32-1 at 11, 14, and Plaintiff does not contend otherwise. Similarly, while Defendant Butler assisted in interviewing Ms. Copeland and Ms. Bolinger, Ms. Sanford's report provides that Mr. Harker, and not Defendant Butler, questioned both. *Id.* at 14–15. There is no indication that Defendant Butler dictated who would be interviewed or otherwise shaped or participated in Ms. Sanford's investigation. Indeed, Ms. Butler left her position with the District two months before Ms. Sanford produced the draft report of her findings and three months before she produced her final report.[10] Dkt. 31 ¶ 28.

---

[10] Ms. Sanford's report refers to instances of data falsification noted in Plaintiff's final evaluation, Dkt. 32-1 at 16, which was written by Defendant Butler; however, there is no indication the evaluation was written to influence the outcome of Ms. Sanford's investigation or that it was meaningfully relied on during the investigation. Instead, the instances of data falsification referred to in the evaluation appear to be those initially uncovered by Defendant Butler and confirmed by Ms. Sanford during her investigation. Further, Defendant Butler, as Plaintiff's supervisor, was responsible for evaluating her, and was therefore engaged in conduct "typical and appropriate" for her position when doing so. *See Lakeside-Scott*, 556 F.3d at 805.

1          After reviewing Ms. Sanford's report, which contained numerous instances of alleged

2    data falsification not previously uncovered by Defendant Butler, *see* Dkt. 32-1 at 14, 16,

3    Superintendent Brewer decided to report Plaintiff's conduct to OPP, believing he was legally

4    required to do so.  Dkt. 29 ¶ 8.  Finally, Superintendent Brewer, and not Defendant Butler,

5    ultimately decided to terminate Plaintiff.  *Id.* at ¶ 11.  Plaintiff does not allege that Defendant

6    Butler was meaningfully involved in or influenced the investigation into Plaintiff's alleged

7    misconduct or the decision to terminate her.  Further, she has not produced any evidence

8    indicating as much.  Instead, the evidence shows "that the final decision-maker made a wholly

9    independent, legitimate decision to discharge [Plaintiff]," uninfluenced by any allegedly

10   discriminatory motive on Defendant Butler's part, thereby eliminating any "causal link" to

11   Defendant Butler's presumed bias.  *See Lakeside-Scott*, 556 F.3d at 807 (cleaned up).

12         For the same reason, Plaintiff cannot establish liability under WLAD.  While WLAD

13   only requires a plaintiff to show that discrimination was a substantial factor in the employer's

14   adverse employment action, *Marquis*, 130 Wn.2d at 114 (citation omitted), as indicated, Plaintiff

15   alleges discrimination by Defendants Butler and Reifenstahl, neither of whom were involved in

16   Plaintiff's termination.  Indeed, Plaintiff does not meaningfully allege any of the involved

17   individuals—Mr. Harker, Ms. Sanford, Mr. Brewer, or even Ms. Copeland—were motivated by

18   discriminatory animus and none of her proffered evidence of discrimination indicates as much.

19   Nor does it indicate that Defendant Butler's assumed discriminatory motive should be attributed

20   to Defendant PASD for the reasons stated above.  *See Boyd v. State, Dep't of Soc. & Health*

21   *Servs.*, 187 Wn. App. 1, 17–18, 349 P.3d 864 (2015) (citing *Staub v. Proctor Hospital*, 562 U.S.

22   411, 421 (2011)) (recognizing that if an employer's investigation results in an adverse action for

23

1    reasons unrelated to the supervisor's original biased action, then the employer will not be liable

2    under WLAD).

3         Plaintiff has failed to present sufficient evidence of pretext.  As such, even drawing all

4    inferences in her favor, no reasonable jury could conclude that Plaintiff's sexual orientation

5    motivated her termination.  Defendants' Motion as to Plaintiff's disparate treatment sex

6    discrimination claims under Title VII and WLAD should be granted.

7         C.    <u>Plaintiff's Retaliation Claims under Title VII and WLAD</u>

8         *1.*    *Legal Framework*

9         Both Title VII and WLAD prohibit employers from discriminating against employees for

10   opposing a practice made unlawful by either statute.  42 U.S.C. § 2000e–3(a); RCW

11   49.60.210(1).  Defendants move for summary judgment on Plaintiff's retaliation claims, arguing

12   Plaintiff has not shown her discharge was retaliatory.  Dkt. 28 at 19–20.

13        Like disparate treatment claims, retaliation claims under both statutes are analyzed using

14   the *McDonnell Douglas* framework.[11]  To establish a prima facie retaliation claim, a plaintiff

15   must show that he or she (1) took a statutorily protected action, (2) suffered an adverse

16   employment action, and (3) there is a causal link between the protected activity and the adverse

17   employment action.  *Porter v. California Dep't of Corr.*, 419 F.3d 885, 894 (9th Cir. 2005)

18   (citation omitted).  Under Title VII, the protected activity must be a "but for" cause of the

19   adverse action.  *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013).  This form of

20   causation "is established whenever a particular outcome would not have happened 'but for' the

21   purported cause."  *Bostock*, 140 S. Ct. at 1739 (citation omitted).  Under WLAD, the causation

22

23       [11] Washington courts also look to federal law in interpreting retaliation claims under WLAD.  *See Cornwell v. Microsoft Corp.*, 192 Wn.2d 403, 415–21, 430 P.3d 229 (2018).  Thus, the Court will consider Defendants' Motion under federal law, looking to Washington case law where appropriate.

1    element requires "that retaliation was a substantial factor motivating the adverse employment

2    decision." *Cornwell*, 192 Wn.2d at 412 (citation omitted).

3        If a plaintiff establishes a prima facie case of retaliation, the burden then shifts to the

4    defendant to articulate a legitimate nonretaliatory reason for the adverse action. *Porter*, 419 F.3d

5    at 894 (citation omitted).  If the defendant sets forth such a reason, the plaintiff bears the ultimate

6    burden of submitting evidence indicating the defendant's proffered reason is merely a pretext.

7    *Id.*

8        Defendants do not dispute that Plaintiff took statutorily protected actions when she

9    complained of discrimination,[12] filed formal complaints alleging discrimination with Defendant

10   PASD and the EEOC, and brought this lawsuit.  Further, they concede she suffered an adverse

11   employment action when she was discharged.  They contend, however, that Plaintiff cannot

12   establish the requisite causal connection between her termination and her statutorily protected

13   actions.  Plaintiff fails to address the merits of Defendants' Motion relative to her retaliation

14   claims, nor does she clearly articulate what conduct she believes was retaliatory.  That being

15   said, in addition to her discharge, Plaintiff appears to allege that Defendants referred her to OPP,

16   provided her with negative job references, and refused to provide her with job references in

17   retaliation for her discrimination complaints. Dkt. 43 at 21.  Further, she indicates her final

18   evaluation from Defendant Butler was retaliatory.  *Id.* at 20.

19       As a threshold matter, in order for these acts to form the basis for Plaintiff's retaliation

20   claims, they must first qualify as adverse employment actions within the meaning of Title VII

21   and WLAD.

22

23       [12] Defendant do not address whether Plaintiff's informal complaint of discrimination to her union
     representative, Mr. Pickens, in April 2019, constituted a statutorily protected action.  Regardless, courts
     have found that making an informal complaint of discrimination constitutes protected activity. *See Ray v.
     Henderson,* 217 F.3d 1234, 1240 n.3 (9th Cir. 2000) (citation omitted).

1     2.     *Prima Facie Case*

2          a.     *Adverse Employment Action*

3     "Not every employment decision amounts to an adverse employment action." *Strother v.*

4  *S. Cal. Permanente Med. Grp.*, 79 F.3d 859, 869 (9th Cir. 1996) (citing cases).  Generally, an

5  "action is cognizable as an adverse employment action if it is reasonably likely to deter

6  employees from engaging in protected activity." *Henderson,* 217 F.3d at 1243.  Plaintiff

7  provides no legal authority or argument addressing whether the retaliatory acts she alleges

8  qualify as adverse employment actions.  That being said, the Ninth Circuit has held that

9  dissemination of a negative employment reference can constitute an adverse employment action

10  if it is motivated by discriminatory intent.  *Brooks v. City of San Mateo*, 229 F.3d 917, 928 (9th

11  Cir. 2000) (citation omitted); *see also Hashimoto v. Dalton*, 118 F.3d 671, 674 (9th Cir. 1997)

12  (citation omitted).  Further, courts have held that an employer refusing to provide a job reference,

13  as opposed to disseminating a negative one, can constitute an adverse employment action if the

14  plaintiff can demonstrate the refusal deviated from the employer's standard practices.  *See*

15  *E.E.O.C. v. L.B. Foster Co.*, 123 F.3d 746, 754–55 (3d Cir. 1997); *Li Zu v. Avalon Health Care,*

16  *Inc.*, 806 F. App'x 610, 625 (10th Cir. 2020).  Finally, a negative performance evaluation can

17  qualify as an adverse employment action if it results in a material change in the terms and

18  conditions of employment.  *Lyons v. England*, 307 F.3d 1092, 1118 (9th Cir. 2002); *see also*

19  *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987) (citation omitted) ("Transfers of job

20  duties and undeserved performance ratings, if proven, would constitute 'adverse employment

21  decisions.'"); *Kortan*, 217 F.3d at 1113 (distinguishing *Yartzoff* because plaintiff's negative

22  evaluation was not accompanied by "different or more burdensome work responsibilities").

23

1    Given this, the Court concludes that Defendants providing Plaintiff with negative job

2    references qualifies as an adverse employment action for the purpose of Plaintiff's retaliation

3    claims. Defendants referring Plaintiff to OPP for committing professional ethics violations

4    likewise qualifies as an adverse employment action because the threat of such a referral, which

5    could lead to professional discipline or loss of license, *see* RCW 28A.410.090, is reasonably

6    likely to deter an employee from engaging in protected activity. That being said, Defendants'

7    refusal to provide Plaintiff with job references does not qualify as an adverse employment action

8    because Plaintiff has not produced any evidence indicating this refusal deviated from

9    Defendants' standard practices. Finally, Defendant Butler providing Plaintiff with a negative

10    final evaluation does not qualify as an adverse employment action because the negative

11    evaluation did not result in a material change in the terms and conditions of Plaintiff's

12    employment. By the time Plaintiff received the evaluation, she was already on administrative

13    leave and being investigated for falsifying student records. Moreover, the negative evaluation

14    did not result in her termination, the finding that she falsified student data did.

15    Thus, because Plaintiff has satisfied her prima facie burden as to the first two elements of

16    her retaliation claims by alleging she was terminated, referred to OPP, and given negative job

17    references following her statutorily protected activities, the remaining question is whether she

18    has established those activities are causally connected to each adverse employment action.

19            b.    *Causation*

20    To establish the requisite causal connection between her statutorily protected activities

21    and the alleged adverse employment actions, Plaintiff must "present evidence sufficient to raise

22    the inference that her protected activity was the likely reason for the adverse action." *Cohen v.*

23    *Fred Meyer, Inc.*, 686 F.2d 793, 796 (9th Cir. 1982) (citations omitted). In doing so, she must

1    demonstrate that the offending actor had actual knowledge of the protected activity or

2    "suspected" she engaged in a protected activity. *Hernandez v. Spacelabs Med. Inc.*, 343 F.3d

3    1107, 1113 (9th Cir. 2003) (citation omitted). Plaintiff may rely on the temporal proximity

4    between her protected activities and the adverse employment actions to establish causation;

5    however, if she relies solely on temporal proximity, the proximity must be "very close." *See*

6    *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (citation omitted).

7         Defendants argue Plaintiff cannot establish a causal connection between her protected

8    activities and her termination because she "did not allege discrimination until after she admitted

9    altering a student's IEP and had been placed on leave pending the District's investigation for

10   falsification of student records." Dkt. 28 at 19. Further, Defendants argue that because Plaintiff

11   was not terminated until February 2020—five months after she lodged her formal complaints

12   against the District—there can be no inference of causation. *Id.*

13        The Court agrees. By the time Plaintiff formally reported her complaints of

14   discrimination to the District and the EEOC in September 2019, Defendants were already

15   investigating her for falsifying student records and she had already been placed on administrative

16   leave. *See* Dkt. 30 ¶¶ 3–5; Dkt. 31 ¶¶ 26–28; Dkt. 32 ¶¶ 2–5. "Evidence of an employer's

17   concerns about an employee's performance before the employee's protected activity undercuts a

18   finding of causation." *Brzycki v. Univ. of Washington*, No. C18-1582-CKJ, 2021 WL 631832, at

19   *12 (W.D. Wash. Feb. 18, 2021) (citing cases).

20        Further, while Plaintiff indicates she reported Defendant Butler's alleged discrimination

21   to Mr. Pickens in April 2019 and that Mr. Pickens subsequently notified Defendant Butler of her

22   complaint, Dkt. 43 at 14, Plaintiff cites no evidence that supports finding anyone responsible for

23   her termination knew or suspected Plaintiff had complained prior to the District's investigation

into her conduct, as required for finding causation.[13]  *Raad v. Fairbanks N. Star Borough Sch. Dist.*, 323 F.3d 1185, 1197 (9th Cir. 2003) (citation omitted) (a plaintiff "must make some showing sufficient for a reasonable trier of fact to infer that the defendant was aware that the plaintiff had engaged in protected activity"); *Strickland v. Seattle Cent. Coll.*, No. C18-1073JLR, 2019 WL 7370338, at *10 (W.D. Wash. Dec. 31, 2019) (cleaned up) (the decision-maker's lack of knowledge about a plaintiff's protected activity breaks the requisite causal link).

Finally, the proximity in time between Plaintiff's April 2019 complaint to Mr. Pickens and her termination in February 2020—ten months later—does not support an inference of causation.  *See Neely v. Boeing Co.*, No. C16-1791-JCC, 2019 WL 2178648, at *7 (W.D. Wash. May 20, 2019), *aff'd*, 823 F. App'x 494 (9th Cir. 2020) (causal connection not established by adverse employment action occurring seven months after internal complaint and five months after complaint to the EEOC); *Breeden*, 532 U.S. at 273–74 (collecting cases and noting courts have found three-month and four-month gaps insufficient to establish causation).  Thus, Plaintiff has failed to establish that her reports of discrimination were causally connected to her termination,[14] and Defendants' Motion as to her claims for retaliatory discharge should be granted.

---

[13] Indeed, Mr. Harker testified that he did not learn Plaintiff was a lesbian until she was placed on administrative leave, Dkt. 50-1 at 17 (62:13–21), indicating he was unaware of her complaint of discrimination on the basis of her sexual orientation until at least that time as well.  Further, even if Defendant Butler reporting Plaintiff's alleged falsification of student data to Mr. Harker following Plaintiff's discrimination complaint to Mr. Pickens could be construed as retaliatory on Defendant Butler's part,  her retaliatory animus cannot be imputed to Defendant PASD for the reasons stated in Section III.B.2.c.ii.2, *supra*.  Defendant PASD's independent investigation into the allegations against Plaintiff cut any causal connection between Defendant Butler's alleged retaliatory animus and Defendant PASD's decision to terminate Plaintiff.  *Poland*, 494 F.3d at 1183.

[14] Even if she had, however, her retaliation claims would still fail because she has not demonstrated that Defendants' legitimate nonretaliatory reason for discharging her—that she falsified student records—is a pretext.  *See* Section III.B.2.c, *supra*.

1    Plaintiff's attempt to establish that Defendant PASD referred her to OPP in retaliation for

2    her complaints of discrimination likewise fails on the element of causation.  While the referral

3    came after Plaintiff's formal discrimination complaints in September 2019, at the time Plaintiff

4    complained, the District's investigation into her alleged misconduct had already been underway

5    for three months.  *See* Dkt. 30 ¶¶ 3–5; Dkt. 31 ¶¶ 26–28; Dkt. 32 ¶¶ 2–4.  Further, Ms. Sanford's

6    final report concluded that Plaintiff had committed professional ethics violations on numerous

7    occasions, Dkt. 32-1 at 16, something which Defendant PASD, believing this to be true, was

8    legally required to report to OPP.  *See* Dkt. 29 ¶ 8.  Plaintiff does not meaningfully allege, nor

9    does the record support finding, that the conclusions in Ms. Sanford's report were motivated by

10   retaliatory or discriminatory animus, or that Ms. Sanford did not genuinely believe Plaintiff had

11   committed ethics violations.  Without such animus, Defendant PASD's decision to refer Plaintiff

12   on the basis of Ms. Sanford's report cannot be deemed retaliatory.  As a result, Defendants'

13   Motion as to Plaintiff's retaliation claims predicated on Defendant PASD referring her to OPP

14   should be granted.

15   With regards to Defendants providing Plaintiff with negative job references, however,

16   Plaintiff has raised a genuine issue of material fact as to whether retaliation was a "but for" or

17   "substantial cause" of this refusal.  Mr. Harker testified that he received phone calls from two

18   school districts asking him if Defendant PASD would rehire Plaintiff, to which he responded that

19   it would not.  Dkt. 30 ¶ 14.  Mr. Harker also testified that one of the reasons he would not rehire

20   Plaintiff was because she had filed this lawsuit.  Dkt. 50-1 at 7–8 (21:20–25:16).  This indicates

21   that part of his motivation in saying the District would not rehire Plaintiff—i.e., giving her a

22   negative job reference—was because she engaged in a statutorily protected activity by filing a

23   lawsuit alleging discrimination.  Given this, Plaintiff has satisfied the prima facie elements of a

1    retaliation claim predicated on Defendant PASD providing her with negative job references.

2    Further, because Mr. Harker admitted that Plaintiff's lawsuit was a basis for his provision of the

3    negative job references, a genuine issue of material fact exists as to whether any legitimate

4    nonretaliatory reason for those references—because Defendant PASD determined Plaintiff had

5    falsified student records—is a pretext.  Thus, Defendants' Motion as to any retaliation claims

6    predicated on the District's provision of negative job references should be denied.

7            D.    Claims Against Individual Defendants

8            Defendants move to dismiss the individual Defendants—Defendants Butler and

9    Reifenstahl—from this lawsuit.  Dkt. 28 at 23.  Because the Court dismissed Defendant

10   Reifenstahl on May 25, 2021, Dkt. 39, Defendant's Motion as to her is moot.  As to Defendant

11   Butler, Defendants argue she should be dismissed because there is no individual liability under

12   Title VII and because claims against individuals acting in their official capacity should be

13   dismissed whenever the public entity itself has been sued.  Dkt. 28 at 23.  It is true that Title VII

14   does not contemplate individual liability.  *Holly D. v. Cal. Inst. Of Tech.*, 339 F.3d 1158, 1179

15   (9th Cir. 2003) (citations omitted) ("We have consistently held that Title VII does not provide a

16   cause of action for damages against supervisors or fellow employees.").  WLAD, on the other

17   hand, does.  *Brown v. Scott Paper Worldwide Co.*, 143 Wn.2d 349, 358, 20 P.3d 921 (2001)

18   (providing that WLAD, by its terms, contemplates individual supervisor liability, and that a

19   "supervisor acting in the interest of an employer who employs eight or more people can be held

20   individually liable for his or her discriminatory acts").  That being said, the Court recommends

21   granting Defendants' Motion and dismissing on summary judgment all of Plaintiff's claims, save

22   her retaliation claims predicated on Defendant PASD's dissemination of negative job references.

23   Because Defendant Butler is not implicated in or responsible for that act, she cannot be held

1    individually liable for it under WLAD. *See id*. at 361 (supervisors may be held liable for their

2    discriminatory acts) (emphasis added). As such, Defendants' Motion as to the individual

3    Defendants should be granted, and Defendant Butler should be dismissed.

4            E.       Defendants' Affirmative Defenses

5            Plaintiff moves to dismiss nine of Defendants' affirmative defenses on partial summary

6    judgment: (1) Plaintiff has failed to state a claim upon which relief can granted; (2) Plaintiff's

7    claims are barred by the applicable statute of limitations; (3) Defendants' actions were done for

8    legitimate nondiscriminatory reasons; (4) Defendants would have terminated Plaintiff regardless

9    of the presence of any alleged discrimination or retaliation; (5) Defendants' reasonable exercise

10   of discretion and judgment are not actionable; (6) Plaintiff's damages, if any, were caused by her

11   comparative fault; (7) Plaintiff has failed to mitigate her damages; (8) Defendants are entitled to

12   immunity; and (9) Defendants' alleged defamatory statements were privileged. *See* Dkt. 35.

13           Plaintiff primarily argues that the affirmative defenses in question are "unsustainable"

14   and should be dismissed. Dkt. 35 at 4–7. Her Motion is therefore better construed as a motion to

15   strike affirmative defenses under Federal Rule of Civil Procedure 12(f) for being "insufficient . .

16   . redundant, immaterial, impertinent or scandalous." Such a motion must be filed, however,

17   within twenty-one days of service of the answer that raises the challenged defenses. Defendants'

18   Answer was filed on June 12, 2020, Dkt. 11, and Plaintiff did not bring the present Motion until

19   May 24, 2021, Dkt. 35—almost a year past the motion to strike deadline. In light of the missed

20   deadline and the fact that the Court finds no cause to strike the defenses on its own accord

21

22

23

1    under Rule 12(f)(1), it assesses Plaintiff's Motion under the applicable summary judgment

2    standard, and not the Rule 12(f) standard.[15]

3              On summary judgment, the moving party first bears the burden of showing that there is

4    "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

5    law." Fed. R. Civ. P. 56(a).  Further, "a party seeking summary judgment always bears the

6    initial responsibility of informing the district court of the basis for its motion, and identifying

7    those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file,

8    together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue

9    of material fact." *Celotex*, 477 U.S. at 323 (quoting Fed. R. Civ. P. 56(c)).  Plaintiff has failed to

10   satisfy this burden here.

11             In support of her Motion challenging Defendants' first two affirmative defenses—(1)

12   Plaintiff has failed to state a claim upon which relief can granted, and (2) her claims are barred

13   by the applicable statute of limitations—Plaintiff simply argues that the defenses are

14   "unsustainable" and should be dismissed.  Dkt. 35 at 4.  She provides little more in support of

15   her Motion on Defendants' third and eighth affirmative defenses—(3) Defendants' actions were

16   done for legitimate nondiscriminatory reasons, and (8) Defendants are entitled to immunity—

17   arguing that in addition to being unsustainable, the defenses are not proper affirmative defenses.

18   *Id.* at 4–5.  She cites no authority to support this conclusion.  With regards to Defendants' fourth,

19   fifth, sixth, and seventh affirmative defenses—(4) Defendants would have terminated Plaintiff

20   regardless of the presence of any alleged discrimination or retaliation; (5) Defendants'

21   reasonable exercise of discretion and judgment are not actionable; (6) Plaintiff's damages, if any,

22

23             [15] Defendants filed an Amended Answer on June 7, 2021, Dkt. 40; however, their June 12, 2020
     Answer first raised the affirmative defenses Plaintiff now challenges.  In any event, twenty-one days have
     also passed since Defendants filed their Amended Answer.

REPORT AND RECOMMENDATION - 45

were caused by her comparative fault; and (7) Plaintiff has failed to mitigate her damages—

Plaintiff makes unsupported factual arguments challenging Defendants' ability to sustain the

defenses, but fails to demonstrate a lack of material fact regarding whether Defendants can do so.

*Id.* Finally, Plaintiff's Motion as to Defendants' ninth affirmative defense—(9) Defendants'

alleged defamatory statements were privileged—is moot, as Plaintiff has abandoned her

defamation claim. *See* Dkt. 53 at 3.

Plaintiff's unsupported and conclusory assertions fail to adequately inform the Court of

the basis for her Motion and are insufficient to find that Defendants' affirmative defenses

"cannot be genuinely disputed" or that Defendants "cannot produce admissible evidence" in

support of their defenses. Fed. R. Civ. P. 56(c). As such, Plaintiff has not met her burden on

summary judgement, and her Motion should be denied.

IV.    CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment, Dkt. 28, should

be GRANTED IN PART and DENIED IN PART. Plaintiff's hostile work environment and

disparate treatment claims under Title VII and WLAD should be dismissed with prejudice, as

should her Title VII and WLAD retaliation claims predicated on her termination, Defendant

PASD's referral of charges against her to OPP, Defendant PASD's refusal to give her job

references, and Defendant Butler's final negative performance evaluation. Defendant Butler

should also be dismissed from this lawsuit. Plaintiff should be permitted, however, to maintain

her Title VII and WLAD retaliation claims predicated on Defendant PASD's dissemination of

negative job references. Finally, Plaintiff's Motion for Partial Summary Judgment, Dkt. 35,

should be DENIED.

/ / /

1

V.    OBJECTIONS

2      Objections to this Report and Recommendation, if any, should be filed with the Clerk and

3   served upon all parties to this suit within **fourteen (14) days** of the date on which this Report and

4   Recommendation is signed.  Failure to file objections within the specified time may affect your

5   right to appeal.  Objections should be noted for consideration on the District Judge's motions

6   calendar for the third Friday after they are filed.  Responses to objections may be filed within

7   **fourteen (14)** days after service of objections.  If no timely objections are filed, the matter will be

8   ready for consideration by the District Judge on **October 15, 2021**.

9

10      Dated this 1st day of October, 2021.

11

12

13                                              S. KATE VAUGHAN
                                                United States Magistrate Judge
14

15

16

17

18

19

20

21

22

23

REPORT AND RECOMMENDATION - 47